CHARLES BUTLER, survivor, &c. v. DAVID COLDEN MURRAY
and others.

The master of a vessel is for most purposes the agent of the owner of the ship or cargo; but that agency does not extend to a sale of either, unless there is a necessity at the time for so doing.

As to the *degree* of the necessity which must be shown to have existed, in order to justify a sale of the ship or cargo.

In order to justify the sale of a cargo at an intermediate port, several things must concur: 1st. There must be a necessity for it arising from the nature or condition of the property, or from an inability to complete the voyage by the same ship, or to procure another. 2d. The captain must have acted in good faith. 3d. He must, if practicable, consult with the owner before selling.

Where there is a question for the jury, on the facts as to the necessity for a sale of the cargo, the court should submit the case to the jury, instead of ordering a verdict for the plaintiff.

And if the jury should believe from the testimony, that judging from the condition of the cargo at the port where sold, it could, if re-shipped by any vessel and sent to its port of destination within a reasonable time, be so damaged as to be practically valueless, the master in an action against him to recover the value, will be entitled to a verdict.

And where the master of a vessel conveying a cargo of hides, found the cargo at an intermediate port, to be in a bad and perishing condition, and summoned three respectable men, dealers in, and shippers of hides, to examine the cargo, and declare what it was proper for him to do, under the circumstances, who advised a sale, and the hides were sold accordingly. *Held*, that although this advice was not conclusive, yet that it should be taken into consideration by the jury in determining the question as to the necessity of a sale, and was entitled to very considerable weight.

*Appeal from the Superior Court of the city of New York.*

THIS action was commenced by N. Rogers & Co., against D. Colden Murray and others, owners of the schooner Pedee, to recover the value of a quantity of hides shipped on board the Pedee, at Aspinwall, consigned to the plaintiffs at New York. The defendants set up, that the vessel having been forced to put into the port of Carthagena, in distress, the hides were discovered to be in a perishing condition, and that the master, acting in good faith,

and in the exercise of a sound discretion, to prevent further loss, had ordered them to be sold at auction; and that they were so sold; and that the defendants had tendered the proceeds to the plaintiffs, after deducting certain amounts due for general average and expenses.   The issues came on to be tried before Justice SLOSSON, and a jury, on the 28th day of May, 1857, and a verdict was rendered for the defendants.   The plaintiffs appealed to the general term, where the judgment was reversed and a new trial ordered, on the ground that the verdict was not only against evidence, but should have been for the plaintiffs. The cause was again tried before Justice SLOSSON and a jury, on the 8th day of February, 1859, and that judge charged the jury, that pursuant to the decision at general term, they must find for the plaintiffs, and the only ques-tion for them to decide, was the amount of damages.   The jury found a verdict for the plaintiffs for $881.38.   Judg-ment being entered, the defendants having taken excep-tions to the charge, appealed to the general term, where the judgment was affirmed October 25th, 1859.   From that judgment the defendants appealed to this court.

The facts substantially are that the schooner Pedee, be-. longing to the defendants, sailed from the port of Aspin-wall for New York, *via* the port of St. Jago de Cuba, on the 6th day of July, 1855, having on board a cargo of hides and skins, old iron, copper, rigging and ivory nuts. The plaintiffs held a bill of lading for part (about one-half) of the hides and skins, the iron, copper and rigging shipped by A. M. Price & Co., and another bill of lading for the ivory nuts shipped by E. Duckworth & Co.   The schooner was well manned and equipped.   On the second day out from port, the first mate was taken sick with the Chagres fever, and within two or three days the master, Captain James Y. Carr, the second mate, and the rest of the crew, were taken down with the same disease.   The two mates and one of the crew died.   The master and the rest of the

crew were unable, from sickness, to navigate the vessel, and for nearly sixty days she was almost entirely at the mercy of the wind and waves. About the 31st of July she was blown ashore near Darien on the coast of the Spanish Main, and considerably injured, losing her false keel, spars, &c. On the 1st of September she got into the port of Carthagena, distant some five hundred miles from Aspinwall, in distress. Upon her arrival it was discovered that the hides and skins were overrun, and being eaten up and destroyed by worms and bugs, which attack hides in tropical climates. A survey of the hides was called by the master, acting under the advice of the United States Consul. This survey was made by three respectable American merchants, who declared and reported that the hides and skins were generally very much injured by worms, that a great portion of them were so much eaten up as to be almost valueless, and that in their opinion none of the hides and skins could be taken to New York, and that they ought to be sold " on account of whom it might concern, in order to save further loss." The master, acting under the survey and under the advice of the Consul, and having taken the opinions of respectable merchants engaged in the trade, and knowing the condition of the hides; considering them as perishing; that he was unable to take them into his own vessel as they would be utterly destroyed; and unable to transship them to be forwarded by another vessel, as they could not be transshipped unless they were first cleaned and dressed; and as he had no funds for this purpose, and had not necessary facilities for so doing, and had no skill or experience in such business, and as there was much doubt of the propriety of his attempting the experiment, he, after having the hides cleaned as well as he could, ordered them to be sold at public auction. Due and ample notice of the sale was given, and the hides and skins were sold by the government auctioneer at the Arsenal wharf at Carthagena, on the 27th day of October, 1855. After

the sale a letter was received by Foster & Horner, at Car-
thagena, from E. Duckworth, the shipper at Aspinwall of
the ivory nuts consigned to the plaintiffs, and also a partner
of A. M. Price, the shipper of the hides, expressing his
satisfaction that the hides were to be sold, and requesting
them to look after the hides, &c. The hides and skins of
the plaintiffs brought $344.66. The defendants having
deducted general average on the entire shipment to the
plaintiffs, including the ivory nuts, iron, &c., tendered
the balance to the plaintiffs before action brought. The
hides and skins were purchased by Messrs. Foster &
Horner, American merchants at Carthagena, and after being
thoroughly beaten, cleaned, immersed in sea-water, &c.,
were shipped by the brig Abrasia to New York, and were
there sold, February 2d, 1856, at private sale, for about nine
hundred dollars, after deducting charges. The schooner
Pedee was repaired, left Carthagena on the 21st of Novem-
ber, 1855, and sailed to St. Jago de Cuba, and thence to
New York, where she arrived March 3d, 1856.

*John Sherwood*, for the appellants.

I. The general rules of law applicable to this case are
perfectly well settled that, in cases of necessity, the master
is by law created the agent of all parties concerned—the
owners of the cargo as well as of the vessel. His acts,
done under these circumstances, in the exercise of a sound
discretion, are binding upon all parties in interest. (The
Gratitudine, Sir Wm. Scott, 3 Rob. Ad., Phila. ed. 211—
other editions 240; *Miston* v. *Lord*, 1 Blatch. C. C. R. 354.)
That where the cargo is perishable and perishing, so that
it will become worthless, it is the duty of the master, exer-
cising in good faith a sound discretion, in the absence of
instructions from the shipper, to sell the cargo, and the
owners of the vessel will be discharged from all liability.
(The Gratitudine, *supra; Miston* v. *Lord*, *supra;* The Ann

D. Richardson, 1 Blatch. C. C. R. 458; and, especially, *Smith* v. *Martin*, opinion of Chief Justice TILGHMAN, 6 Binney, 266.) See, also, 1 Arnold on Insurance, page 187, showing distinction between the English and American cases; that, by the American law, not only the right of selling perishable cargo is conceded, but the duty is enjoined upon the master. (See also *Jordan* v. *The Warren Ins. Co.*, 1 Story C. C. R. 352-3.) That though the cargo may have been delivered at its destination in specie, still, if it would have become worthless, it is the duty of the master to sell. (*Jordan* v. *Warren Ins. Co., supra;* 2 Smith's Leading Cases, 695–6.) Nor need the necessity be actual in order to justify the master in making the sale. The necessity must be estimated and determined from all the facts then within his means of knowledge. This is enough, though subsequent events prove that the cargo might have arrived with safety at the port of destination. (1 Parsons on Contracts, 66, and cases cited; The Barque Gentleman, 1 Blatch. C. C. R. 201; *Smith* v. *Martin, sup.; Maas* v. *The Schooner Pedee, sup.*) A survey by competent surveyors is the most important element in determining the character of the emergency, and, especially, the good faith of the master. (The Henry, 1 Blatch. & Howland, 465.) The opinions of respectable, reliable merchants, engaged in business at Carthagena, who saw the hides and knew the circumstances of the case, to establish the good faith and proper exercise of discretion on the part of the master, are entitled to the greatest weight. (*Fenwick* v. *Bell*, 1 Car. & Kir. 312; 1 Phil. on Ev. 290.) The testimony relating to the sickness of the master and crew, on her voyage from Aspinwall to Carthagena, was proper to show the character of the emergency, the necessity that occasioned the injury to the vessel, and the necessity for seeking the port of Carthagena. And further, to show the distress that resulted in the loss for which the defendants seek to recover the proportion of general average. And

so of the testimony in respect to the condition of the vessel
and difficulties of the voyage before her arrival at Cartha-
gena.

II. The questions then being, whether there was a neces-
sity for the sale of the hides, according to the facts as they
appeared at Carthagena, whether the master acted honestly
and in good faith, and whether he exercised prudence and
sound discretion in taking the course he did; the judge
at the trial should have submitted those questions to the
jury.    The judge directed the jury to find for the plain-
tiffs, only leaving them to determine the question of the
amount of damages.   The defendants' exceptions to this
ruling were well taken.    These questions are questions of
fact for the jury to determine.   (*Smith* v. *Martin*, *supra*.)
Questions of necessity, of negligence, of care and dili-
gence, and of the prudence and discretion to be exercised
by the master of the vessel, are questions to be submitted
to a jury.   (*Aymar* v. *Astor*, 6 Cow. 266; *Patrick* v. *Hal-
lett*, 1 J. R. 241; *Moore* v. *Westervelt*, 21 N. Y. R. 103;
*Bell* v. *Smith*, 2 J. R. 98; *Sherwood* v. *Ruggles*, 2 Sand.
58; *Child* v. *The Sun Mutual Insurance Company*, 3 Sand.
26; *Minturn* v. *Allen*, 3 Sand. 50—approved on appeal, 3
Selden, 220.)   To admit a positive instruction to find for a
particular party, is allowable only where the evidence
leaves no reasonable doubt of the facts in issue.   (*St. John*
v. *The Mayor of New York*, 6 Duer, 315–17.)   To war-
rant an unqualified direction at the trial in favor of one or
the other party, the evidence must be undisputed, or the
preponderance must be so strong as to admit of no reason-
able doubt.   (*Crawford* v. *Wilson*, 4 Barb. 504–18; *Rich*
v. *Rich*, 16 Wend. 663.)   Negligence is in all instances a
question of fact, and it is only where a question of fact is
entirely free from doubt, that the court has a right to apply
the law without the action of the jury.   (*Bernhardt* v.
*Rensselaer & Saratoga Railroad Company*, 32 Barb. 165–
9—approved in the court of appeals, 23 Howard Pr. 166.)

To determine what a man of ordinary care and prudence would do under circumstances involving more or less conjecture, is a question which can only be settled by a jury. (Same case; *Harris* v. *The Northern Indiana R. R. Co.*, 20 N. Y. R. 232; *Mangam* v. *Brooklyn City R. R. Co.*, 36 Barb. 230; *Williams* v. *Vanderbilt*, 29 Barb. 504—affirmed on appeal December, 1863.) The evidence in this case is contradictory. 1st. As to the actual perishability of hides attacked by worms. 2d. As to the true condition of the hides at Carthagena. 3d. As to the true ability of the master to raise funds to cure, clean and tranship the hides.

III. If there is no contradiction upon these points, the jury should have been directed to find for the defendants. The evidence of what occurred at Carthagena would have authorized that direction, certainly, if the evidence of subsequent events had been disregarded. The court cannot, for the purpose of directing a verdict for the plaintiffs, assume that the defendants' witnesses are not to be believed. (*Merritt* v. *Lyon*, 3 Barb. 110.) The court below would not, unless they disbelieved most of the witnesses, or overlooked their testimony, have found facts which would authorize the direction given to the jury.

*J. Edgar*, for the respondents.

I. The master possessed no authority to sell the goods, on account of their perishable nature.

1. The possibility of the hides becoming valueless from bugs, was a danger inherent to their nature, and not a danger of the sea. It was a danger assumed by the owners of the hides when they were shipped, and foreseen by the master; and it was the duty of the master to preserve them as well as possible by the means within his reach, and deliver them in specie to the consignees according to the bill of lading. (*Elliott* v. *Russell*, 10 John. R. p. 1; *Kemp* v. *Coughtry*, 11 John. 107; *McArthur* v. *Sears*, 21

Wend. 190; *Parsons* v. *Hardy*, 14 Wend. 215; *DeMott* v. *Laraway*, id. 225; *Gould* v. *Hill*, 2 Hill, 623; *Van Natta* v. *The Mutual Security Insurance Co.*, 2 Sand. S. C. R. 490; Bark Gentleman, 1 Olcott's Ad. R. 110; *Hazard's Administrator* v. *New England Mutual Ins. Co.*, 8 Peters (U. S.) Rep. 537.)

2. He could not be certain that they would prove a total loss to the owners, if carried further, and it was not within his province or duty to decide that the interest of the owners would be promoted by a sale at Carthagena. (See case of Ann D. Richardson, 1 Abbott's Admiralty Rep. 499, [506].)

3. Such a doctrine would give the master a wide field for speculating with his cargo, which it is his duty only to protect and transport.

II. But if the master could, in any event, be justified in selling the goods on account of their perishing condition, then the necessity for such a sale on that account must be proved to have been absolute; and if it afterwards appeared that no such absolute necessity did exist, then the master and owners of the vessel are liable for the goods so sold. In this case no such necessity did exist. (3 Kent, 7th ed. 222, 223; 13 Pickering, 543; 1 Abbott's Ad. Rep. 499, [306]; *Myers* v. *Baymore*, 10 Barr [Pa.] Rep. page 114.)

1. The fact that the hides, after the sale, arrived in New York in a tolerably good condition, considered with the reasons given by the master and surveyors for the sale, and the actual cost of cleaning, afford conclusive evidence that there had been no necessity for the sale.

2. The master might have sold a part of the hides, if absolutely necessary to raise funds to clean the balance, but he had no authority to sell the whole.

III. It was the duty of the master to have cleaned the hides and brought them to New York by the Pedee, or to have forwarded them, if possible, by some other vessel.

He could have sent them to their place of destination by the Abrasia. (Abbott on Shipping [4th American ed.], p. 241 to 244; *Schieffelin* v. *New York Ins. Co.*, 9 John. p. 21, &c; *Treadwell* v. *Union Insurance Co.*, 6 Cowen, 270; *Palmer* v. *Lorillard*, 16 John. 348; *Parsons* v *Hardy*, 14 Wend. 215; 3 Kent's Com. 213; *Saltus* v. *The Ocean Ins. Co.*, 12 J. R. 107.)

IV. If the master had re-shipped the hides in another vessel for New York, immediately upon or shortly after his arrival at Carthagena, they might have arrived here before the time they were actually sold at Carthagena; and the defendants have not shown, as they were bound to show (see 9 John. 28), that such reshipment could not have been made.

V. The owners of the vessel are liable for an error of judgment, as well as misconduct of the master, although he may have acted in good faith. (Angell on Com. Car., §§ 182, 185, 520; 3 Kent, 7th ed., 222, 223; *Purviance* v. *Argus*, 1 Dallas, 131, 184, 185.)

VI. The superior court, at general term, upon the first appeal, having decided that the verdict for the defendants at a former trial of this action was contrary to law and evidence (see 3 Bosworth, 357), and no new evidence being adduced upon the second trial, the judge was right in directing a verdict for the plaintiff, as a legal result of the facts proved, and leaving only the question of the amount of damage, less general average, &c., to the jury. The case was fairly submitted to the jury, as far as they had any province in the matter. Besides, there was no conflict of evidence, and no dispute about the facts of the case, except as to the amount of damage, and therefore the conclusion to be drawn from these facts was a question of law. (*Pratt* v. *Foote*, 5 Seld. 463.)

VII. If the judge had stated to the jury, at the second trial, the determination of the court at general term upon this first appeal, but had left it with them to find other-

wise, it would have been error; and if the jury had then again found for the defendants, the court again, on appeal, would have ordered a third trial, as a new trial will always be ordered where the jury "manifestly disregard the determination of the court." The chance of such a delay in bringing the action to a conclusion was properly avoided by the direction of the judge to the jury at the second trial. But if the direction of the judge to the jury was erroneous, and this court see that the verdict was such as should have been found from the facts proved, after a proper charge, then the verdict should not be disturbed. It is enough for the court to see that justice has been done, and a new trial will not be granted, where it should produce the same result.

VIII. None of the defendant's exceptions are well taken, and the judgment should be affirmed.

MULLIN, J. The master of a vessel is for most purposes the agent of the owners of the ship and cargo; but that agency does not extend to a sale of either, unless there is a necessity, at the time, for so doing. (Abbott on Shipping, 365 *et seq.* in notes.)

The degree of the necessity which must be shown to have existed in order to justify a sale of ship or cargo has been differently stated by different judges and writers on maritime law. In 1st Parsons on Cont. 66, it is said: "He (the master) may sell the property entrusted to him in a case of *extreme necessity*, and in the exercise of a sound discretion. Nor need this necessity be actual in order to justify the master and make the sale valid. If the ship was in peril which, as estimated from all the facts within his means of knowledge, was imminent, and made it the most prudent course to sell the ship as she was, without further endeavors to get her out of her dangerous position, this is enough, and the sale is justified and valid although

the purchasers succeed in saving her, and events prove that this might have been done by the master."

In 2d Smith's Leading Cases, 576, the author of the notes says, " In order to make out a case for a sale without express authority, it would appear necessary to show that the property at risk has been placed in a position of such *imminent danger* that it may be destroyed or materially injured, before recourse can be had to those to whom it belongs; unless the intervention of other means is resorted to than those which can be commanded by the master."

Chancellor KENT, in his Commentaries (vol. 3, 173, 4), says, "But if the voyage be broken up by ungovernable circumstances, the master in that case may even sell the ship and cargo, provided it be done in good faith for the good of all concerned, and in a case of *supreme necessity* which sweeps all ordinary rules before it."

Lord ELLENBOROUGH, in *Campbell* v. *Thompson* (2 E. C. L. 480), says, " The master can only sell the cargo in case of *urgent* necessity."

ABBOTT, Chief Justice, in *Trumen* v. *East India Co.* (7 E. C. L. 339), says there must be an *apparent* necessity. In the same case, BAYLEY, Justice, says, " It must be a case of *absolute* necessity." PARK, J., in *Skeen* v. *McGregor* (8 E. C. L. 309), says, "A sale can only be made in a case of *inevitable* necessity."

In Massachusetts, the court says, " there must be a *neces-sity*, or, as it is sometimes expressed, a *legal necessity*, before the master can·sell." (*Bryant* v. *Commonwealth Ins. Co.*, 13 Pick, 543, 551.)

The difficulty lies not so much in finding the rule as in applying it in a given case.

There is no doubt but that, in order to justify the sale of a cargo at an intermediate port, several things must concur.

1. There must be a necessity for it, arising either from the nature or condition of the property, or from the ina-

bility to complete the voyage by the same ship or to pro-cure another.

2. The captain must have acted in good faith.

3. He must, if practicable, consult with the owner before selling. (Abbott on Shipping, 447 and notes; *The New Eng. Ins. Co.* v. *Brig Sarah*, 13 Peters, 387; *Bryant* v. *Commonwealth Ins. Co.*, 13 Pick. 543.)

No question as to the good faith of the captain, or of his inability, under the circumstances, to consult with the owners, is raised. But it is insisted that a necessity for the sale is not proved, for two reasons: 1st. Because the pro-perty, although injured, could by a moderate outlay have been put in order so as to be carried to New York without further material injury; and 2d. The master should have sent forward the property by another vessel.

Neither the master nor owners were answerable for the delay which had occurred after leaving Aspinwall. It was caused by a visitation of Providence, against which human foresight could not guard.

The damage to the hides arose from their own inherent properties and the heat of the climate in which the voyage was made. Before unloading the hides at Carthagena, the worms that caused the damage were discovered on the deck of the vessel—when the hides were taken from the hold and put on the deck—the hair was found eaten off and holes eaten in them; and, if permitted to remain in the vessel, it is not denied but that they would have been utterly ruined. The captain caused them to be beaten while on the deck, which it is shown is one means of removing, in whole or in part, the vermin that was causing the injury. The vessel was found not to be in a condition to continue the voyage, and another ship might have been procured to carry the hides to New York, as the purchasers of them at the master's sale chartered a vessel which brought them to New York.

If the hides were then in a condition which justified a

sale in order to prevent total loss, it would seem to follow that it would have been folly to have hired another vessel to bring to New York property that would be ruined before it arrived.

The question then comes to this: Was the master justified in selling the property at Carthagena? or, in other words, was the condition of the property such that it was necessary to sell it in order to prevent a total loss? It does not appear that the captain had any acquaintance with the means of preventing injury to hides by vermin, other than is possessed by every person in the community. He was called on to deal with the property as it then was, without any peculiar skill as to the best mode of protection or cure. It was quite obvious the property must be removed from the hold, and the master did it. Beating the hides was a mode in which the worms could be removed for the time being, and that was done. There is no evidence that the master knew that washing in sea water would be any greater protection than the means he had already employed. Under these circumstances, he summoned three respectable men, dealers in hides and the shipment thereof from Aspinwall to Carthagena and from the latter place to New York, to examine the hides and declare what it was proper for him to do under the circumstances. They advised a sale, and the hides were sold, and, as witnesses, they swear that the advice was given in good faith. This advice was not conclusive; but the question is whether, on view of the facts then known to the parties, it was apparently necessary to sell the hides. The remarks of Parker, Ch. J., in *Gordon* v. *Massachusetts Fire and Marine Insurance Co.* (2 Pick. 263), in regard to the weight which should be given to a survey of a vessel made after injury, in order to determine what it is the duty of the master to do with her, apply with great force to the point under consideration. He says, when a vessel has been so far injured by a peril of the sea as to make a survey necessary,

and the master, with perfect good faith, calls such a sur-
vey, and the persons appointed to take it are competent in
point of skill and wholly disinterested, and they, after a
full and sufficient examination of the vessel, find her essen-
tially injured, and come to a fair conclusion that, from the
high price of materials and of labor, or the difficulty of
procuring them, the expense of repairing will be more than
the worth of the vessel after she is repaired, and therefore
they advise, for the interest of all concerned, that the ves-
sel be sold,—in such a state of things as this, it seems to
me that a moral necessity is imposed on the captain "to act
according to their advice." The jury, in passing on the
question of necessity, must take into consideration the
opinion of these persons thus called on to aid the master
by their advice, and that opinion is entitled to very con-
siderable weight. "If," say the court in the opinion just
cited, "they acted fairly and the captain acted fairly, his
acts, in conformity with their opinions, will be justified
unless it shall be made to appear by those who contest the
loss that the facts on which they founded their opinion
were untrue, or the inferences they drew from those facts
were incorrect; and the burden of proof should be on those
who would impeach their proceedings."

But it is said that the persons who gave the opinion that
the cargo ought to be sold, assumed, as part of the ground-
work of their opinion, that the hides were to remain on
the Pedee and be carried to New York in her, instead of
being sent forward by another vessel, as it was the master's
duty to do.

The survey, as it is called, does say that the vessel,
having to be repaired in Carthagena, and then go to St.
Jago de Cuba, before the hides could reach New York, it
was almost certain that not a single hide would arrive at
that place. But in the evidence of these witnesses they go
much further than this survey, or rather it is stated as their
opinion that the property was in such a condition that it

ought not to have been re-shipped. Horner testifies that it was his opinion that the hides ought to be sold. Hanabergh says the sale was proper and necessary, owing to the condition of the hides; Foster that a large portion of the hides were only fit for glue—they would become worse daily until totally destroyed. Before examining the hides he thought the best course would be to re-ship them; but, on examination, he was of opinion that the master's only and best course was to sell them. Sanchez, one of the surveyors, testifies that the re-shipment involved the actual loss of the hides. Barros says the hides were too much damaged to be kept any longer without danger of a total loss.

Other witnesses qualify their opinions by saying that the hides would be a total loss if re-shipped on the Pedee, to be by her carried to New York.

I have referred to the opinions of the witnesses to show that there was a question for the jury on the facts, as to the necessity of the sale, and that it was wholly improper, in view of this evidence, to render a verdict for the plaintiff. If the jury should believe, from the evidence of the witnesses, that, judging from the condition of the hides as they were when found on the wharf at Carthagena, that if re-shipped by any vessel, and sent to New York within a reasonable time, they would be so damaged as to be practically valueless as hides, the defendants would be entitled to a verdict.

Although it has happened that the hides did arrive in New York, and were sold for a much larger price than that received in Carthagena, and although it is competent to prove those facts, and for the jury to consider them in determining the question of necessity, yet the question, after all, must be determined upon the facts existing at the time when the sale was made.

In every aspect in which I have examined the case, a case is presented which made it necessary to submit it to

the jury; and because it was not done, the judgment of the supreme court must be reversed and a new trial ordered, costs to abide event.

All the other judges concurring, except WRIGHT, J., who did not vote, judgment reversed.